NOTE:  Pursuant to Fed. Cir. R. 47.6, this disposition
is not citable as precedent.  It is a public record.

# United States Court of Appeals for the Federal Circuit

04-3189

ANGEL L. CRUZ,

Petitioner,

v.

DEPARTMENT OF THE ARMY,

Respondent.

_____

DECIDED:  February 2, 2005

_____

Before BRYSON,  LINN, and DYK, <u>Circuit Judges</u>.

PER CURIAM.

## DECISION

Angel L. Cruz appeals the decision of the Merit Systems Protection Board, Docket No. DA-0432-02-0485-I-1, upholding his removal from his position with the Department of the Army.  We <u>affirm</u>.

## BACKGROUND

Mr. Cruz worked as a GS-4 Medical Support Assistant/Medical Clerk (Data Transcribing) in the Department of the Army.  He was assigned to the Patient Appointment Section ("PAS") of a hospital at Fort Hood, Texas.  Approximately 90

percent of Mr. Cruz's duties consisted of receiving telephonic patient appointment requests and booking the appointments in an automated patient appointment system. Mr. Cruz was supervised by a Lead Clerk who reported to a PAS rater, Carolyn Berry.

On July 1, 2001, Ms. Berry met with Mr. Cruz and provided him with Army Form 7223-1, entitled "Base System Civilian Performance Counseling Checklist/Record" ("Counseling Checklist"). That document contained his performance plan for the 12-month rating period from July 1, 2001, to June 30, 2002. It stated that Mr. Cruz's performance would be rated based on four "responsibilities and performance standards": (1) Technical Competence; (2) Adaptability and Initiative; (3) Working Relationships and Communications; and (4) Responsibility and Dependability. Ms. Berry provided Mr. Cruz with a handout entitled "Performance Standards," which set forth subcategories of tasks for each of the four areas of responsibility. For each task, the Army Regulation 690-400 permits the Army to assign an employee a rating of "Excellence," "Success," "Needs Improvement," or "Fails."

At issue in this case is Mr. Cruz's performance in the area of Technical Competence. The Performance Standard handout divided Technical Competence into four tasks: (1) "Knowledge of the booking menu of [the Composite Health Care System]"; (2) "Productivity"; (3) "Accuracy (Substantiated errors are defined as anytime a patient is inconvenienced because of clerk error[)]"; and (4) "Responsibility of keeping updated [Standard Operating Procedures]." Mr. Cruz experienced difficulty with the task of "Accuracy." In order to receive a rating of "Excellence" or "Success" in that task, he was allowed no more than four errors during his one-year rating period. In the first

04-3189                                    2

two months of the rating period, however, the Lead Clerk reported that Mr. Cruz had committed 19 errors.

As a result of that report, Ms. Berry met with Mr. Cruz on September 6, 2001, to discuss Mr. Cruz's errors. Ms. Berry and Mr. Cruz met again less than three weeks later because Mr. Cruz had made five additional errors since their September 6th meeting. Thereafter, Ms. Berry and the PAS Senior Rater decided to detail Mr. Cruz to the Pulmonary Function Clinic for a month. Ms. Berry testified that Mr. Cruz was sent back to the PAS after only 15 days because he made too many errors. At that point, Ms. Berry decided to place him on a Performance Improvement Plan ("PIP").

In a memorandum dated October 24, 2001, Ms. Berry informed Mr. Cruz that he was being placed on a PIP because he was not performing his duties in a satisfactory manner, specifically with regard to the Technical Competence responsibility. The PIP memorandum explained that his unsatisfactory rating was attributable to his performance in the Accuracy task. The memorandum explained that the performance standard for the Accuracy task was "[n]ot more than 4 substantiated errors in the rating period" and advised Mr. Cruz that he needed to bring his performance in the Accuracy task up to an acceptable level by January 7, 2002. At a meeting on November 1, 2001, Ms. Berry warned Mr. Cruz that if he did not bring his performance up to an acceptable level by January 7, he would be reassigned, reduced in grade, or removed from federal service. Notwithstanding those warnings, the Lead Clerk testified at the hearing before the Board that Mr. Cruz made an additional 11 errors during the PIP period. That testimony was corroborated by the Counseling Checklist, which was introduced into evidence at the Board hearing.

In a notice dated February 20, 2002, Ms. Berry informed Mr. Cruz that he had not brought his performance up to an acceptable standard and that she was proposing to remove him from his position. The notice of removal stated that Mr. Cruz had "over 25 substantiated errors in booking patient appointments during a 4 month period since the start of [his] rating cycle on 1 July 2001," while "[t]he performance standard called for not more than 4 errors during the 12-month rating period." The notice further stated that while Mr. Cruz was given an opportunity to improve his performance between October 24, 2001, and January 7, 2002, Mr. Cruz "showed no improvement and . . . continued to make errors in booking appointments."

On April 28, 2002, Mr. Cruz was removed from his position. He appealed that decision to the Board. In the proceedings before the Board, Mr. Cruz asserted that the agency had discriminated against him by failing to accommodate his hearing disability and that the agency had removed him because of discrimination based on his race, national origin, and age. Mr. Cruz also argued that the agency did not receive approval from the Office of Personnel Management ("OPM") regarding its performance appraisal system; he challenged the validity of the Army's performance standards; and he asserted that the Army had failed to prove that his performance was unacceptable.

The Board rejected Mr. Cruz's arguments, finding (1) that the Army had shown that his performance was unacceptable; (2) that the Army's performance standards were valid; and (3) that OPM had approved the Army's performance appraisal plan. The Board also determined that Mr. Cruz had failed to prove that the Army had discriminated against him.

DISCUSSION

Mr. Cruz does not appeal the Board's decision regarding discrimination. Rather, his appeal concerns aspects of the Board's decision pertaining to the Army's performance appraisal system.

First, he argues that the Counseling Checklist and the Army's regulation governing the responsibilities listed in the Counseling Checklist, Army Regulation 690-400, violated 5 U.S.C. § 4303 because they did not define what constituted unacceptable performance based on the "critical elements" of an employee's position. Section 4303 states: "An employee whose reduction in grade or removal is proposed under this section is entitled to . . . 30 days' advance written notice of the proposed action which identifies . . . the critical elements of the employee's position involved in each instance of unacceptable performance." 5 U.S.C. § 4303(b)(1). Pursuant to 5 C.F.R. § 432.103(b), a "critical element" is defined as "a work assignment or responsibility of such importance that unacceptable performance on the element would result in a determination that an employee's overall performance is unacceptable." Pursuant to 5 C.F.R. § 432.103(h), "unacceptable performance" is defined as "performance of an employee that fails to meet established performance standards in one or more critical elements of such employee's position."

Mr. Cruz argues that because his Counseling Checklist used the term "responsibilities" instead of the term "critical elements" in describing the standards used to evaluate his performance, the position description and performance standards failed to inform him of what constituted critical elements. The use of different terminology in the Counseling Checklist, however, did not render those standards invalid. Army

Regulation 690-400 states that each responsibility in the Checklist is a "critical element in the Base system as defined by 5 CFR 430." Army Regulation 690-400, § 1-5(i). The regulation also states that an employee covered by the Base system will be rated "unsuccessful" if the employee "is rated FAILS in 1 or more Responsibilities – regardless of the ratings assigned remaining Responsibilities." Id. Hence, the Checklist and the accompanying regulation make clear that the consequences of failing to meet the requirements of one or more "responsibilities" are identical to the consequences of failing to meet the standards of one or more critical elements under 5 C.F.R. § 432.103.

Next, Mr. Cruz argues that the Army's performance standards were "absolute" and did not permit an accurate evaluation of his job performance on an objective basis, as required by 5 U.S.C. § 4302(b)(1). Section 4302(b)(1) states that performance standards must, "to the maximum extent feasible, permit the accurate evaluation of job performance on the basis of objective criteria . . . related to the job in question for each employee or position under the system." 5 U.S.C. § 4302(b)(1). In Guillebeau v. Department of the Navy, 362 F.3d 1329 (Fed. Cir. 2004), this court explained that government agencies are allowed "great flexibility to choose or develop their own systems" for performance appraisal, id. at 1336, and that there is no general prohibition against "absolute" performance standards; thus, performance standards can provide that a single incident of poor performance will result in an unsatisfactory rating on a job element, as long as the standards are "reasonable, based on objective criteria, and communicated to the employee in advance." Id. at 1337. The court noted that the reasonableness standard would prohibit the adoption of an accuracy rate that is unrealistically high under the circumstances; for example, it "might be unreasonable for

an agency to adopt a standard permitting so few errors in pulling medical records from files that, based upon the number of records the employee is required to pull, the employee must be at least 99.91% accurate." Id., citing Blain v. Veterans Admin., 36 M.S.P.R. 322, 325 (1988).

Mr. Cruz asserts that his situation falls within the court's example because the standard of committing no more than four errors in one year "could not be achieved by anyone." The evidence, however, does not support Mr. Cruz's assertion. For example, one of Mr. Cruz's former co-workers testified that she never made more than four errors in any rating period. The Lead Clerk also testified that none of the PAS clerks other than Mr. Cruz had committed more than four errors in an entire rating year. Accordingly, the record reflects that it was not unreasonable to expect employees to commit no more than four errors in a rating period. Moreover, unlike the example in Guillebeau, the evidence did not show that Mr. Cruz had to process so many calls that the "four error" standard required him to attain an impossibly high level of accuracy.

Mr. Cruz argues that his evaluation was not accurate or based on objective criteria because there was "no objective record keeping of errors and correction of errors" and, more specifically, there were "no patient complaints filed against Cruz and thus there was no objective manner to evaluate when a patient was inconvenienced." Rather, he contends, "[a]ll alleged errors were generated by management reviews of Cruz's work." The evidence before the Board, however, was that various medical clinics notified Mr. Cruz's supervisors of improperly booked appointments, including appointments booked at the wrong clinic or with the wrong type of physician. The supervisors testified that upon receiving notification of each error, they would research

the error and meet with the clerk to discuss the problem. The evidence further showed that Mr. Cruz's immediate supervisor had devised a procedure for keeping track of clerk errors. Hence, while patients did not file complaints directly with Mr. Cruz's supervisors, substantial evidence supports the Board's finding that the clinics' complaints served the same purpose and that there was a systematic means of evaluating and keeping track of errors in order to obtain an accurate evaluation of the clerks' work.[1]

Mr. Cruz argues that neither his PIP nor his notice of proposed removal provided him with "specific instances of his alleged unacceptable performance but rather vague references to over 25 substantiated errors since July 1, 2001." Under 5 U.S.C. § 4303(b)(1)(A)(i), an employee is entitled to 30 days' advance written notice identifying "specific instances of unacceptable performance by the employee on which the proposed action is based." Mr. Cruz contends that instead of referring to the number of errors, the PIP should have listed his errors "by date, time, and name of patient." The Army did not provide specific instances in either the PIP memorandum or the notice of removal, but only made references to the number of errors. Before the Board, however, the Army provided detailed written and testimonial evidence regarding seven specific errors, and Mr. Cruz was given the opportunity to challenge the evidence as to each of those allegations. Moreover, because of the error review procedures established by the Lead Clerk, Mr. Cruz had the opportunity to challenge each of errors at the time they were discovered. Accordingly, even if the formal written notices should have contained

---

[1] We note that the Performance Standards handout that Mr. Cruz received did not set forth what level of performance is necessary to be given a rating of "Fails." Mr. Cruz does not argue that the absence of a level of performance for "Fails" barred the Army from putting him on a PIP. We do not address that question, because he did not raise that issue before this Court.

more specificity as to the particular errors that Mr. Cruz committed, he was given ample notice of those errors and opportunities to challenge them. Thus, any error in the degree of specificity of the written notices was harmless.

Mr. Cruz refers to a discrepancy between the number of errors noted in the January 14, 2002, entry on his Counseling Checklist (eleven) and the number of errors for which the Army provided evidence at the Board hearing (seven). However, Mr. Cruz does not challenge the charge that he made more than four errors after he wsa placed on a PIP. Accordingly, the discrepancy in the number of errors is not fatal to the Army's case.

Mr. Cruz also alleges that the PIP memorandum did not provide a standard for measuring improvement and that the PIP was unclear as to whether he was allowed to make "no errors or one error or four errors." The PIP memorandum, however, stated that the performance standard for the Accuracy task required that Mr. Cruz make "[n]o more than 4 substantiated errors in the rating period," i.e., not more than four errors per year. It is clear that in order to bring his performance level up to an acceptable level, Mr. Cruz needed to decrease his error rate so that he could show that he was capable of making no more than four errors per year. The Board, however, reviewed in detail the evidence regarding six of the errors that the Army claimed that Mr. Cruz had made during the three-month period after the beginning of his PIP and found that Mr. Cruz had committed each of those errors. Four of those errors were committed prior to the January 7, 2002, date by which he was told he had to demonstrate an improvement in his performance, and two of those errors were committed during the period after that date but before he was given his notice of removal. Based on those documented errors

alone, his error rate during the three-month time period following the issuance of his PIP was approximately 24 errors per year. In light of that confirmed error rate, it was reasonable for the Army to conclude that Mr. Cruz had failed to demonstrate an improvement in his performance to an acceptable level.

Finally, Mr. Cruz contends that his senior rater did not review and approve his PIP. Army Regulation 690-400, ¶¶ 1-5a(2) and 1-5a(4), states that the senior rater must review and approve a performance plan in order for the plan to take effect. The Board found that Mr. Cruz's senior rater had reviewed and approved his PIP both "at the beginning of the rating period and at any other time that the agency's expectation regarding his performance were related to him." The record supports the Board's determination. The senior rater testified that she reviewed and approved the Counseling Checklist by initialing it each time Mr. Cruz was counseled about his behavior, and Mr. Cruz failed to present any evidence to rebut that testimony.

Because the Board's decision was supported by substantial evidence and was not legally erroneous, we uphold the decision sustaining Mr. Cruz's removal.